HELEN GLADWIN *v.* THE HOTEL BOND COMPANY ET AL.

SUPERIOR COURT        HARTFORD COUNTY        FILE No. 93863

Memorandum filed July 13, 1954.

*Leon A. Bradbury,* of Hartford, for the plaintiff.

*Day, Berry & Howard, Robert E. Courtney, Jr., Davis, Lee, Howard & Wright, Joseph P. Cooney, Frank Covello* and *Schofield & Fay,* all of Hartford, for the defendants.

MOLLOY, J. Helen Gladwin and Ellis Gladwin are husband and wife and were joined as parties plaintiff in this action. By agreement of counsel Ellis Gladwin was dropped as a party. Of the original defendants all were dropped except Frank Zazzaro, d.b.a. Tri Street Parking, and Lyman Fladger and Herman H. Cion, d.b.a. Bond Plaza Parking. So the action proceeds against these named defendants.

On the evening of March 25, 1952, the plaintiff, Helen Gladwin, in company with her husband and another couple, was planning to have dinner with them at Adajian Restaurant on Asylum Street, Hartford. Her husband drove the car with his passengers

from Ford Street into the parking lot, hereafter known as lot 2, operated, under lease, by defendants Fladger and Cion, and which is adjacent to the rear of buildings facing Pearl Street and on the north side thereof. To the north of this parking lot and adjacent thereto is the parking lot, hereafter known as lot 1, operated, under lease, by the defendant Zazzaro, with the driveway from Asylum Street opposite the Bond Hotel. The boundary line running east and west between the two parking lots was not marked by any fence or other permanent demarcation, but lengthy pieces of timber or logs were lying on the ground at irregular intervals along said boundary line. They were dark in color and not readily distinguishable from the ground on which they rested; indeed they were invisible to a casual passerby, in the dark or dim light. Exhibit A, a map, and the photos of the area, exhibits D, E, F, FF, and G, and exhibits 1, 2, 3 and 4, portray very well the locus involved, the true boundary line, the use made of the timbers, particularly the irregular line of the timbers as in exhibits 1 and 4.

At the time in question, the easterly half of the east-west boundary line referred to was dark, as the lots were provided with a single dim light located near the old trailer shown in the exhibits. Lot 2 was filled with cars parked closely together. One row of these cars faced north with their front tires up against the aforesaid timbers, lying along the boundary line. One and a half to two feet of the forward parts of this front row of cars extended over the timbers already hidden in the darkness and shadow of the closely parked cars.

Upon leaving the plaintiff's car, the plaintiff and her party proceeded to make their way directly north in the direction of Asylum Street over the boundary line and over the Zazzaro lot 1, adjacent to Asylum Street. It was the shortest way to get to Asylum

Street and one of the routes customarily used by patrons of both parking lots to reach Asylum Street. The plaintiff was unaware of the presence of the timbers in her path. She was in the lead. When she reached one of the timbers, unseen by her, her feet struck against it and she was caused to fall over the timber and to the ground. From this fall she received painful, severe and permanent injuries.

The conclusion, in the court's mind, is irresistible that the plaintiff was free from contributory negligence; that the course she took and her manner of proceeding between the cars and directly toward Asylum Street was quite natural and reasonable, the conduct of a reasonably prudent person. Indeed, her party was directed by the attendant of lot 2 to take the course she did. It is the further firm conclusion of the court that there was negligence in the use of the timbers under the circumstances and in the manner they were used, particularly in the night season, and that that negligence was the proximate cause of the plaintiff's fall and her consequent injuries. The troublesome question, however, is whether the judgment should be against Zazzaro, alone, or against Fladger and Cion, alone, or against the owners of both lots. The court is inclined to the belief that judgment should be against the operators of both parking lots.

The position of the defendants Fladger and Cion is that the fall occurred on the land of Zazzaro, the claim being that the timbers, at the time in question, were north of the true boundary line, and therefore Zazzaro, being the possessor and in control of that land, is solely liable. The contention of the defendant Zazzaro, in short, aside from the claim of no negligence on his part and of contributory negligence on the part of the plaintiff, is that she had no legal right upon his lot, and therefore there is no liability. It seems to the court that the question is not that simple.

The plaintiff seeks recovery against the defendants Fladger and Cion on the ground that she was a business visitor or invitee on their premises; that the timber causing the fall was on land in their possession and control, and they owed the duty to be accorded a business visitor or invitee; that they knew or should have known that the presence of the timber involved an unreasonable risk to the plaintiff; and that they took no steps to remedy the condition or to warn the plaintiff thereof.

The plaintiff's claim of liability on the part of Zazzaro is based on the belief that she was also a business visitor on his land; that the timber was lying on land in his possession in violation of the duty he owed her as a business visitor; that the liability of Fladger and Cion does not preclude liability also on Zazzaro; that the timber involved an unreasonable risk to the plaintiff; that he took no steps to remedy the situation or to warn the plaintiff thereof; and finally, that Zazzaro is liable even if the plaintiff be deemed to be merely a gratuitous licensee.

For several years before Zazzaro leased, on November 8, 1951, parking lot 1, it was leased to Fladger and Cion. During these several years parking lot 2 was also leased to Fladger and Cion, so that they operated both lots as a single parking area extending in an L-shape from Ford Street to the section facing Asylum Street opposite the Hotel Bond. During these years there was no dividing line between the two lots, although the title to the land was in different owners. Cars, parked on what later became parking lot 1, often departed by traveling over what later became parking lot 2; and cars parked on lot 2 often departed over what became lot 1. Similarly with passengers, going from or coming to their cars on either lot, they crossed over the other lot. After Zazzaro leased lot 1, to all appearances the two parking lots were but one. Fladger and Cion continued to operate

under the name of "Bond Plaza Parking"; a sign to that effect facing the entrance on Ford Street; and Zazzaro began operating lot 1 under the name of "Tri Street Parking." The free movement of vehicles over both lots was made possible by the operators of the lots in that at the southwest corner of lot 1 and at intervals north thereof, ample space was left between the timbers for such vehicular ingress and egress.

The practice of vehicular and pedestrian traffic over each others' lot and the accommodation of each of the parking lots to the uses of the other were not prohibited, indeed they were permitted and consented to. It was the well-known practice. This was, of course, for the common interest and mutual advantage of the operators of both lots. This was the situation on March 25, 1952, the date of the plaintiff's fall. All the operators knew of the practice of vehicular and pedestrian travel over their lots.

To this background there should be added some additional facts. The operators, although they disclaim the placing of the timbers, cannot deny that they maintained them, no matter who placed them originally. A few days after the accident the defendant, Fladger, said to the plaintiff's husband, "I was afraid something like that might happen. I never wanted them there in the first place."

The timbers served two purposes: (1) marking substantially the boundary line between the two lots; (2) and acting as a barrier for the orderly parking of cars. These purposes suited the operators; that is what they wanted and intended. To the parking public the first purpose was not so obvious. The timbers were not affixed to the ground and so, in the course of time and usage, they became, at times, disarranged and extended over on the Zazzaro lot; this was not to the displeasure of Cion; he had more room for cars.

The location of the timbers at the time of the accident is in dispute. In this regard it must be remembered that the defendants' photos, exhibits 1 to 4, were taken on October 4, 1952, over six months after the accident; the plaintiff's photos, exhibits D to G, were taken March 27, 1952, two days after the plaintiff's fall. Also, it appears that about ten days after the accident, Cion told Attorney Solomon that the timbers were on the boundary line. Ellis Gladwin, the husband, said that on March 27, 1952, he observed the timbers in question and found them "extending from a point at the north corner of the little old trailer directly across to the corner of the one-story brick building known as A. B. Bachner," which is the easterly point of the true boundary line. It is a fair conclusion, therefore, as claimed by the plaintiff, that on March 25, 1952, and at the time of the fall, Fladger and Cion were in possession and control of the land north to said log or timber causing the fall, and Zazzaro was in possession and control of the land south to said timber; and that at said time and place said log or timber was consented to and accepted by Fladger and Cion as being on the northern boundary line of their parking operations; and likewise, said timber was consented to and accepted by Zazzaro as being on the southern boundary of his parking operations. The place of the fall was nearer to the easterly end of the boundary line than to the westerly end; much more so. It is the court's conclusion that the timber was on the boundary line at the time and place in question.

In *Laube* v. *Stevenson,* 137 Conn. 469, 473, it is stated: " 'A business visitor is a person who is invited or permitted to enter or remain on land in the possession of another for a purpose directly or indirectly connected with business dealings between them.' Restatement, 2 Torts § 332." *Lubenow* v. *Cook,* 137 Conn. 611, 613. Without further citation

of authorities, it is clear that the plaintiff was a business visitor of the defendants Fladger and Cion. To such person they owed the duty to use reasonable care to keep their premises reasonably safe.

In this case, the plaintiff could reasonably believe that she could make her exit to Asylum Street by crossing what was in fact parking lot 1, but what in fact would appear to be a part of lot 2, operated by Fladger and Cion. The absence of any visible barrier and the appearance of unity would reasonably lead to the conclusion that there was a safe exit to Asylum Street.

As relates to Zazzaro, it is difficult to follow the plaintiff's claim that the plaintiff was a business visitor on the premises of Zazzaro, lot 1. This claim is, of course, built up upon the unusual situation of the common practice of parkers to use both lots, and so Zazzaro's, indiscriminately, as the occasion demanded in going to or from either lot. It is true it was to Zazzaro's interest not to forbid such practice; he was not in the business of offending patrons of either lot; and so the universality of the practice may be admitted, but this does not seem to the court to warrant that person being considered as a business visitor on Zazzaro's lot.

Zazzaro is in the same position as Fladger and Cion on the questions of his negligence in the maintenance, jointly with Fladger and Cion, of the timbers, in the manner and under the circumstances they did and in the place they did, on the boundary line between the two lots; and his neglect to take steps to remedy the situation or to warn the plaintiff thereof; both lot owners were negligent and proximately so.

It would seem, however, that the plaintiff's relationship to Zazzaro was more reasonably that of a "gratuitous licensee" on his land. This is reasonably deducible, as said before, because of the common

practice of parkers on lot 2 to cross lot 1, Zazzaro's, without hindrance, indeed with apparent consent and acquiescence, and because of the general situation.

In *Laube* v. *Stevenson,* 137 Conn. 469, 473, it appears: " 'A licensee is a person who is privileged to enter or remain upon land by virtue of the possessor's consent, whether given by invitation or permission.' [Restatement, 2 Torts] § 330. 'A gratuitous licensee is any licensee other than a business visitor as defined in § 332.' 2 id. § 331." The court went on to say (p. 474): "It is true that 'An owner of land ordinarily owes no duty to a licensee, any more than he does to a trespasser, to keep his premises in a safe condition because the licensee or trespasser must take the premises as he finds them and assumes the risk of any danger arising out of their condition.' *Hayes* v. *New Britain Gas Light Co.,* 121 Conn. 356, 357. . . . 'When, however, the presence of a licensee upon the property of another becomes known to the owner, the latter may owe to him a duty not to subject him to danger.' *Deacy* v. *McDonnell,* 131 Conn. 101, 104. . . . The owner of premises may also be under a duty to warn a licensee, of whose presence he becomes aware, of dangerous conditions which the owner knows of but which he cannot reasonably assume that the licensee knows of or by a reasonable use of his faculties would observe."

In view of the circumstances surrounding the operation of the parking lot of defendant Zazzaro, there is no question that patrons of the other parking lot crossed his lot with his permission and consent. The long standing custom of which he was well aware and his failure to take any effective means to control it, indicate permission, consent. Even if the plaintiff was mistaken in her belief that she had permission to cross the lot of defendant, Zazzaro, her mistake was one to which he contributed. All the surrounding circumstances tended toward a belief that customers

of either lot were permitted on the premises of both. *Crogan* v. *Schiele,* 53 Conn. 186, at 204, lends support to the conclusion of the court that Zazzaro is also liable; that he owed the plaintiff at least the duty owed a gratuitous licensee. He knew of the dangerous condition or should have known of it, and knowing of the common practice and custom to pass over his land from the adjoining lot, failed to remedy the situation which both he, Fladger and Cion knew to exist and which they, indeed, maintained jointly. Liability is found on the part of both lot operators.

The plaintiff sustained a fracture of her left elbow. Without entering into a too detailed description of her injury, suffice to say it was severe and resulted in considerable suffering for over a year and ended in a 15 per cent permanent incapacity of the arm. It cannot be extended to normal, and this impairment is noticeable as the arm hangs by the side.

After being in a cast until April 30, 1952, with much pain and incapacity to herself, the cast was removed for a series of physiotherapy treatments at the Hungerford Hospital in Torrington, Connecticut, till May 19, 1952, when, upon x-rays being taken, the true condition of the elbow was disclosed, a bone block. Further physiotherapy treatments were ordered, three and then two times a week, necessitating much pain, till September 24, 1952. The condition of the arm not improving, her doctors decided on an operation which was had January 9, 1953, at the Hartford Hospital. She left it January 13, 1953, with a cast the full length of her arm, and then physiotherapy treatments were again resorted to; these continued till April 9, 1953. About sixty-six such treatments were had. The arm has now reached its maximum improvement.

The plaintiff's medical expenses total $831.50 and her household expenses due to her incapacity $46, or

a total of $877.50. Judgment may enter for the plaintiff to recover of the defendants Frank J. Zazzaro, Lyman Fladger and Herman Cion, $9377.50.